## Shoemaker's Ex'r et al. v. Consorti et al.

## Methodist Church Of Wellston, Ohio, v. Shoemaker's Ex'r et al.

October 7, 1947.

Rehearing denied December 5, 1947.

W. Scott Miller, Judge.

Woodward, Dawson, Hobson & Fulton, Wilbur O. Fields, Lee S. Jones and James S. Shaw for appellants.

Robert E. Hogan, Michael M. Hellmann and Henry J. Tilford for appellees.

OPINION OF THE COURT BY JUDGE SILER—Reversing.

This case involves two appeals, but it appears to be necessary to treat only one, in view of the manner of our final disposition.

In the beginning, this was a petition seeking a settlement of the estate of Chris C. Shoemaker, deceased, but a subsequent pleading made it a declaratory judgment action seeking a judicial interpretation of Shoemaker's will.

Merrill Shoemaker and Willard Bartoe, nephews of the decedent and also beneficiaries under his will, are the principal appellants, while Silvio Consorti and Methodist Church of Wellston, Ohio, beneficiaries under the same will, are opposed to these two nephews. Both Consorti and the Wellston Church will be considered as if they were joint appellees for the purpose of this appeal.

The chancellor having interpreted the will in a manner favorable to Consorti and the Wellston Church but in a manner unfavorable to the two nephews and others of their group, the latter have appealed from the chancellor's judgment and now seek its reversal on the ground that it is contrary to the preponderance of all the evidence, that is to say contrary not only to the burden of the testimony of human witnesses bearing on the testator's intention but also to that of the testimony of the will itself speaking forth as a living document.

The Shoemaker will, unwitnessed and holographic, was written on two pages of letter size paper and about one month before the testator's death. We now give a copy of the verbatim contents of the two pages of this will, showing likewise approximate spacing of words and lines therein.

# THE SHOEMAKER WILL

(First page)

"Louisville, Ky.

April 26th. 1944

My last Will and Statement.

All obligations shall be paid in full.

1.000 Life Insurance with
Metropolitan Life Ins. Co.

Mrs. Williard Bartoe.  Sister
99 Monroe St. Nelsonville  Ohio.

$3.000

Neal Shoemaker, Brother
815 Brener St.  Saginaw Mich.

$3.000

Thomas Shoemaker.  Nephew.
Wellston Ohio.

3-$1.000 Government Bonds.

Merrill Shoemaker.  Nephew.
Springfield. Ohio,

15—$1.000 Government Bonds.

Methodist Church,
Wellston  Ohio.

$1.000,

Trinity Temple Methodist Church.
Louisville  Ky.

$2,000.

(Second page)

Williard Bartoe
Hulmesville; Pa.

$15.  1000 Government Bonds.

Silvio Consorti
Louisville  Ky.

$3,000, and all household goods and fur-
nishings, and ward robe.

To remaining Nephews and Nieces $2.00,00
each.

$5.00.00 Kosair Childrens Hospital

$5,00,00 Deaconess. Hospital

If there is any other money, lift or Stocks, they shall
be devided among Nephews
and Nieces.

I desire a very simple funeral,

Lead Kindly Light, Abide With Me,
hymns, Twenty Third Psalm.
Bury me Wellston, Ohio, on family lot beside my
Mother, who'es prayers, have been answered and I'm
sure her children are at rest with her, with the
Master.

C. C. Shoemaker.
Attorney.                               Louisville, Ky.
Lewis Bradbury.                    Executor.''

Now Chris C. Shoemaker, a 63 year old bachelor
at the time of his death, was born and partly reared in
Wellston, Ohio, but for 25 years preceding his death
he had lived in Louisville, where he had followed the
restaurant business. Through his individual thrift and
industry, he had succeeded in accumulating an estate
of about $71,000, mostly in cash and government bonds.
He seems to have operated on a pay-as-you-go plan
and accordingly owed practically nothing when he died.
His life insurance amounted to $1000 and it was pay-
able to his estate. He was survived by an only sister,
Mrs. Willard Bartoe, Sr., an elderly woman living in
Ohio, also by an only brother, Neal Shoemaker, an el-
derly citizen of Michigan, also by nephew Willard Bar-
toe, Jr., a son of the only sister, also by nephew Merrill
Shoemaker, a son of the only brother, also by nephew
Thomas Shoemaker, mentioned specifically in the will,
also by a number of other nephews and nieces not men-
tioned specifically in the will. All relatives lived in
distant localities. During a period of about 15 years
preceding death, Shoemaker had lived in an apartment
with Silvio Consorti, a 70 year old bachelor, who is a
native of Italy and who was both employee and close
friend of Shoemaker. While the apartment seems to
have been Consorti's, yet its furnishings appear to have
been Shoemaker's. Shoemaker was a religious man, a
member of Trinity Temple Methodist Church of Louis-
ville, now one of the appellants, which was named as a
beneficiary under the will and which was a church where
Shoemaker sang in the choir and where he made some-
what substantial and regular contributions. Shoemaker
greatly revered the memory of his mother and the qual-
ity of her religion. Her church membership was in
the Methodist Church of Wellston, Ohio, and she was

buried in that community, but not in any church cemetery.

Appellants, consisting of testator's only sister, Mrs. Bartoe, and of his nephews, Merrill Shoemaker and Willard Bartoe, and of his membership church, Trinity Temple Methodist Church of Louisville, all want the will construed so as to give each the amount specified *under* the individual name rather than the amount specified *over* the name. Adherence to their theory of construction would add $2,000 to Mrs. Bartoe's part, $12,-000 to Merrill's part, $13,000 to Willard's part, $1,000 to Trinity Temple's part. The chancellor did not adopt that theory.

Appellees, consisting of the Wellston Church and Consorti, both want the will construed so as to give each the amount specified *over* the individual name rather than the amount specified *under* the name. But it should be added that Consorti wants this construction to also include the bequests under his name. In other words, Consorti wants a general *over* construction followed, but he also wants both the *over* and the *under* constructions followed as to himself in view of the peculiar characteristics of the will as it reaches his own name. Adherence to their theory of construction adds $14,000 to the Wellston Church's part and $12,000 to Consorti's part. The chancellor adopted this theory.

Did Shoemaker regard his only sister to the extent of $3,000 or merely to the extent of $1,000? Did he regard his only sister's boy and his only brother's boy, that is to say the nephews, Merrill and Willard, to the extent of $15,000 each or merely to the extent of $3,000 as to Merrill and $2,000 as to Willard? Did he regard his membership church, Trinity Temple, to the extent of $2,000 or merely to the extent of $1,000? Did he regard his mother's Wellston Church to the extent of $15,000 or merely to the extent of $1,000? Did he regard his friend, Consorti, to the extent of $18,000 plus other personal property or merely to the extent of $3,000 plus the other personal property? These are the questions to be answered.

Evidence of friends, neighbors, associates, relatives, professional consultants was produced on both sides of this controversy for the purpose of showing the inten-

tion of this testator as indicated by declarations made by him at various times in relation to the general subject of his property disposition. This evidence in a case of this particular kind seems to be competent, relevant and material. See Eichorn v. Morat, 175 Ky. 80, 193 S. W. 1013. These various witnesses testified in a general way about Shoemaker's state of affection or lack of it for his sister, for his nephews, for his membership church, for his mother's church, for his friend, Consorti. But the main and crucial question was, we believe, what he definitely said about disposing of his property. Only two witnesses testified specifically on that subject. Lona B. Scott, a disinterested witness who had worked for Shoemaker for some years, stated that Shoemaker had declared that he wanted to leave Merrill enough to go in business for himself. Also, John A. Braun, another disinterested witness who had made income tax returns for Shoemaker for several years, stated that Shoemaker had declared that he wanted to leave Merrill enough to go into the five and ten cent store business and wanted to leave Willard enough to continue his study in the field of chemistry.

### The Consorti-Wellston Construction

The Consorti-Wellston construction, the one adopted by the chancellor, was the *over* construction.

Following this construction, we find that the will thereby gives testator's only sister a mere $1,000 in insurance proceeds, which, in effect, gives her nothing whatever in hand, because she herself, as it was proven, owed the testator a debt of more than $1,000. But besides being the only sister of Shoemaker, Mrs. Bartoe was shown to be old, frail, needy and the wife of a blind husband. Furthermore, it seems that Shoemaker happened to be, when he died, right in Mrs. Bartoe's Ohio home, where she sat at his bedside and watched his vitality ebb out into the channel of death.

Again, following this *over* construction, we find that the will thereby gives only $3,000 to Merrill to start a five and ten cent store business. While this sum might somewhat tend to provide the amount necessary to carry out testator's expressed intention in this respect, yet it must be admitted that such an intention could not really

be adequately carried out for such a sum in these times of inflated values. For $3,000 Merrill could hardly buy a thriving second-hand store on a back street.

Still further following this *over* construction, we find that the will thereby gives $15,000 in government bonds to the Wellston church, where, according to all the proof, the testator never belonged, never attended in later years, never contributed, never visited, even though he frequently visited his mother's grave in the same city. Admitting the reverence the testator always had for his mother's memory, it must nevertheless seem apparent that this $15,000 gift resulting to her Wellston Church from the *over* construction was one of abnormality rather than otherwise, especially so in view of the sound financial status proven to exist in that church.

Continuing with the *over* construction, we find that the will thereby gives only $2,000 to Willard to pursue a career in chemistry study. While this sum might somewhat tend to provide the amount necessary to carry out testator's expressed intention in this respect, yet it must be admitted that such an intention could not really be adequately carried out for such a sum in these times of high prices for the necessities of life. For $2,000 Willard would probably be stretching his dollars wide to meet his family budget over a period of more than a half year.

Lastly, it should be observed that adherence to this *over* construction produces the very awkward effect of leaving a $2,000 gift suspended, like a helicopter hovering over the Grand Canyon, down at the bottom of page one, a donation without the semblance of a donee anywhere in sight.

### The Nephew Construction

The nephew construction, the one rejected by the chancellor, was the *under* construction.

Following this construction, we find the will thus making first mention of testator's obligations and then immediately thereafter providing for their payment out of a $1,000 insurance policy, which approximated the amount of his small debts and funeral expenses.

Again, following this *under* construction, we find

the will thereby placing testator's only living sister and only living brother on a basis of exact equality with gifts of $3,000 to each and with 15 one thousand dollar government bonds to the son of each, the testator's nephews, Merrill and Willard.

Still further following this *under* construction, we find the will thereby placing the $2,000 gift at the bottom of page one in the hands of a present and waiting receiver, the testator's own church, before it proceeds to page two, thus completing the contents, sense, meaning and unity of this document page by page.

Getting now into the broad principles to be applied in the judicial construction of wills, we find some that seem to shine forth like Mars at perihelion. And we set out a few of the pertinent ones as we have found them written in the books.

The cardinal rule in the construction of wills is to ascertain the testator's intention. Nelson v. Nelson, 241 Ky. 564, 44 S. W. 2d 555; Buckman's Trustee v. Ohio Valley Trust Co., 288 Ky. 114, 155 S. W. 2d 749, 138 A. L. R. 436; Shedd's Adm'r v. Gayle, 288 Ky. 466, 156 S. W. 2d 490; Medcalf v. Whitely's Adm'x., 290 Ky. 94, 160 S. W. 2d 348, 140 A. L. R. 936.

Law favors equality in distribution under wills, and all ambiguity will be determined in favor of such distribution, unless contrary intention clearly appears. Shackelford v. Kauffman, 263 Ky. 676, 93 S. W. 2d 15; Bean v. Bean, 271 Ky. 403, 112 S. W. 2d 70; Oliver v. Oliver, 286 Ky. 6, 149 S. W. 2d 540.

In arriving at a testator's intent, the will should be considered as a whole or in its entirety by a court. Maingault's Adm'r v. Carrithers, 295 Ky. 654, 175 S. W. 2d 129; Borders v. Skiles, 295 Ky. 670, 175 S. W. 2d 353; Wilson v. Gilliam, 296 Ky. 708, 178 S. W. 2d 425.

A court, in determining intention of a testator, will place itself in the testator's situation at the time of the execution of the will. Felty v. Easterling, 286 Ky. 34, 149 S. W. 2d 760.

Adopting the legal principles set out above and using their illuminating beams to dispel, as much as pos-

sible, the dark shadows cast by the mystery of this will, we find ourselves seeking most of all this testator's true and specific intention. Also, we find ourselves seeking a definite equality between the testator's nearest of living kindred, his only surviving sister and his only surviving brother. Also, we find ourselves looking at this will as a whole, at every word and line of it. And lastly, we find ourselves sitting down in the testator's chair, using his own hand, looking right out of his eyes, trying to think his very thoughts. In pursuing these objectives, we now reach the conclusion that Shoemaker gave, as shown by the preponderance of the evidence of living witnesses as well as that spoken by the will itself, unto Mrs. Bartoe $3,000 instead of only $1,000, gave unto Merrill $15,000 instead of only $3,000, gave unto the Wellston Church $1,000 instead of $15,000, gave unto the Trinity Temple Church $2,000 instead of only $1,000, gave unto Willard $15,000 instead of only $2,000, gave unto Consorti $3,000 plus household goods and furnishings and wardrobe instead of $18,000 plus the same personal effects just mentioned.

The provisions, other than those mentioned above, contained in the chancellor's judgment and pertaining to other features of this case are not to be disturbed but are to remain and continue in full force and effect.

Wherefore, the judgment is now hereby reversed for the entry of a substitute judgment consistent with the views expressed herein.

Judge Dawson did not sit in this case.

Judge Cammack dissenting.

I think the will is so worded that it is virtually impossible to arrive at the true intent of the maker, and, therefore, it is void for uncertainty. But should it be deemed not void, then I think the interpretation of the chancellor should be followed.